Filed 1/18/24  P. v. Porter CA2/1

Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOHN JAY PORTER et al.,<br><br>     Defendants and Appellants. | B318879<br><br>(Los Angeles County<br>Super. Ct. No. A968974) |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed as to defendant and appellant John Jay Porter.  Affirmed and remanded with instructions as to defendant and appellant Dayon Darren Lively.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant John Jay Porter.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Dayon Darren Lively.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Idan Ivri and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

This is an appeal from the denial of petitioners John Jay Porter's and Dayon Darren[1] Lively's petitions for sentencing relief pursuant to former Penal Code section 1170.95, now section 1172.6.[2] We affirm.

A jury convicted Porter and Lively of the first degree murder of Latonjyia Stover (count 9) and second degree murder of Jamee Finney (count 10). The same jury convicted petitioners' confederates Lyndell Tyrone Jackson, Vincent Burks, and Deautri Cosslolo Denard of murdering Stover and Finney. The murders occurred after petitioners and their confederates sought revenge for a drug transaction in which the drug dealer, Buford "B.J." Bates, substituted flour for cocaine.

The resentencing court[3] found, and petitioners do not dispute, this case involved mistaken identity. Specifically, the resentencing court found Lively participated "on this mission to kill Nina Bates . . . . the sister of Buford Bates . . . who sold the phony cocaine." The resentencing court also found that Porter "had the intent to kill Nina Bates, the sister of Buford Bates, and

_____

[1] The record contains various spellings of Mr. Lively's middle name. We use the spelling contained in the abstract of judgment.

[2] Undesignated statutory citations are to the Penal Code.

[3] Different judicial officers presided over petitioners' trial and the order to show cause hearings on their petitions for sentencing relief. We refer to the court presiding over the latter hearings as the "resentencing court."

any member of her family or any person connected to Nina Bates." The murder victims—Stover and Finney—were not connected to the drug transaction.

With respect to the first degree murder of Stover, petitioners argue the resentencing court erred in finding they failed to establish a prima facie case of eligibility for resentencing. We conclude petitioners cannot establish a prima facie case as a matter of law. Given the trial court's instructions and the jury's verdict, the jury necessarily found true all elements of murder under current law.

With respect to the second degree murder of Finney, Porter argues the resentencing court applied the wrong standard of proof at his order to show cause hearing. To the contrary, the record demonstrates the court considered whether the prosecution demonstrated beyond a reasonable doubt that Porter was guilty of murder under the current definition of murder.

Lively, who had a separate order to show cause hearing, argues the resentencing court erred in proceeding in his absence. Lively was not absent from the hearing. He participated remotely via Webex,[4] a procedure he asked the resentencing court to use. Lively does not demonstrate either error in proceeding remotely or prejudice from doing so.

The parties argue, and we agree, that the trial court committed clerical error in the Lively judgment when it transposed the names of certain counts comprising his convictions. Upon remand, the resentencing court is instructed to correct that clerical error and to forward a certified copy of the

---

[4] The parties do not dispute that Webex is a videoconferencing platform.

3

amended abstract of judgment to the Department of Corrections and Rehabilitation.

## PROCEDURAL BACKGROUND

In addition to the kidnapping of Kelly Timmons (also known as Kelly Davis) for ransom and other crimes, a jury convicted Porter and Lively of first degree murder (Stover) and second degree murder (Finney).  (*People v. Denard et al.* (Oct. 12, 1995, B066109) [nonpub. opn.].)  With respect to the first degree murder, the jury found two special circumstances true—murder in the course of kidnapping and multiple murder.

On direct appeal, in 1995, this court affirmed the judgments of conviction.  (*People v. Denard et al.*, *supra*, B066109.)

In 2019, petitioners filed petitions for resentencing pursuant to former Penal Code section 1170.95, now section 1172.6.  The resentencing court appointed counsel for petitioners.

Lively substituted counsel after the resentencing court denied his petition as to count 9 at the prima facie stage.  His new counsel filed a "Pre-Hearing Memorandum."  (Boldface & some capitalization omitted.)  The memorandum discussed a declaration made by Deautri Denard, in which he took responsibility for the "heinous crimes" and indicated Lively was not responsible.

Also according to Lively, Porter issued a declaration providing:  "On May 9, 1988, I John Porter was involved in the murder of (Lato[njyia] Stover and Jam[e]e Finney) and the kidnapping for ransom of (Kelly Timmons) . . . . I John Porter shot and kill (Laton[jyia] Stover and Jam[e]e Finney), with a nine-millimeter, I shot numerous times into the little red car on the corner of Vernon and St. Andrews Street.  At the time, I shot

4

into the car, I was thinking that it was (Nina Bates) the sister of (Buford Bates) that (Kelly Timmons) gave the money to and got a five pound bag of flour, that should have been a kilo of cocaine for fourteen thousand, five hundred dollars. I had to kidnap (Kelly Timmons) to make her tell me ware (Buford Bates—aka—B.J.) drug house and ware he hanged out. I declare that (Dayton Lively, Vincent Burks, and Lyndell Jackson) had no involvement of the murders of (Laton[jyia] Stover and Jam[e]e Finney). I shot and kill both (Stover and Finney) on my own, I pull the trigger until there was no movement in the car." In his "Pre-Hearing Memorandum," Lively reserved the right to testify.

With respect to the Stover murder, the resentencing court found petitioners failed to present a prima facie case. The court relied on the absence of a first degree felony murder instruction (because at the time of trial, kidnapping was not a qualifying offense for first degree felony murder). The court noted "in-camera hearings" of a recorded conversation by Denard indicating Denard and Porter were the shooters. The court also noted that at trial, the People did not rely on the natural and probable consequences doctrine with respect to the Stover murder. The court found petitioners failed to establish a prima facie case for resentencing relief because they directly aided and abetted murder with intent to kill—a valid murder theory under current law.

With respect to the murder of Finney, the resentencing court issued an order to show cause. Lively's hearing was held separately in order to secure Lively's presence. After the hearings and considering over 100 volumes of reporter's trial transcripts, the resentencing court denied the petitions. Petitioners timely appealed. We filed an opinion November 15,

2023 and later vacated that opinion to reconsider the appeal in light of the Supreme Court's November 27, 2023 decision *People v. Curiel* (2023) 15 Cal.5th 433 (*Curiel*). We also allowed supplemental briefing to give the parties an opportunity to address *Curiel*.

## FACTUAL BACKGROUND

On appeal, Porter and Lively rely exclusively on the factual background from our opinion in their direct appeals. We recognize that opinion is not admissible to establish the facts in an order to show cause hearing under section 1172.6. (*People v. Vance* (2023) 94 Cal.App.5th 706, 712–713 (*Vance*).) By relying exclusively on the factual background in our prior appellate opinion and failing to summarize the evidence before the resentencing court, Porter and Lively have forfeited any objection to the inadmissibility of the prior opinion. (*Id.* at p. 713.) We thus quote our prior opinion, the only factual summary petitioners provide on appeal. (*People v. Denard*, *supra*, B066109.)

"On May 9, 1988, Porter telephoned Roland Timmons and asked if Timmons knew where Porter could buy cocaine for Denard. Timmons, who previously had sold drugs with Porter, asked his sister, Kelly Timmons, if she could set up the transaction. Ms. Timmons arranged for Porter and Denard to give $14,000 to B.J. Bates, a drug supplier, in exchange for a kilo of cocaine, with herself as go-between. Ms. Timmons drove to Porter's house, met Porter and Denard, and received the money. After counting the money, Timmons met Bates' underling at the agreed meeting place, gave him the money, and received a plastic bag containing white powder. Ms. Timmons drove back to Porter's house and gave the bag to Porter and Denard. As

6

Ms. Timmons was leaving, Porter and Denard ran outside, shouting that she had given them flour instead of cocaine, and forced her inside the house at gunpoint.

"Ms. Timmons, who had not known the powder was flour, unsuccessfully tried to telephone Bates. She made a series of calls to her brother in which she told him Porter and Denard wanted their money or the cocaine and would kill her if Timmons did not comply. During the calls, Porter and Denard repeatedly told Timmons they would kill his sister if their demands went unmet. During one of these calls, Timmons heard Denard blame Porter for the situation and threaten to kill Porter. Porter sounded scared in the initial calls, but never asked for help.

"Denard telephoned Lively. Shortly thereafter, Lively and Burks arrived in a beige jeep. Lively and Denard forced Ms. Timmons into the jeep at gunpoint, and Ms. Timmons, Burks, Denard, Lively, and Porter drove a circuitous route to an apartment. En route, Denard called [Meridith Yulonda] Carter[5] on a cellular telephone and told her to bring guns to the apartment. The men also called Timmons again and repeated their threats to kill Ms. Timmons unless they received the cocaine or money.

"Jackson arrived at the apartment shortly after the beige jeep, as did another man named Moe. Carter and a woman named Red arrived a little later. After Denard told Carter what had happened, Carter pointed a gun at Ms. Timmons and said Carter should kill her.

---

[5] The jury did not convict another co-defendant, Meredith Yulonda Carter, of murder but only of false imprisonment.

Lively and Denard forced Ms. Timmons to give them information about Bates, his sister, family, address, and cars. Lively said the men should retaliate against Bates. Porter and Denard, in a series of telephone calls to Timmons, repeated their death threats against Timmons and his family. They also telephoned such a threat to Timmons' mother. Meanwhile, Timmons called the police, who came to his house and placed a telephone trap on Timmons' line to determine the threatening calls' origin.

"Denard sent Burks and Porter to get ammunition. They returned with it. Denard and Lively said they were going to retaliate against Bates. At Denard's request, Carter supplied a box of surgical gloves and a bag containing a dark sweatshirt, ski masks, and gloves. Burks, Lively, and Porter donned surgical gloves and wiped off several guns. Denard distributed masks to Burks, Lively, and Porter. Denard and Lively put gloves in their pockets. Denard announced they were going to find and kill Bates and told Carter and Jackson to stand guard over Ms. Timmons. Burks, Denard, Lively, and Porter, all armed, left together, leaving Carter, Jackson, Moe, and Red to guard Ms. Timmons.

"While the 4 men were gone, Carter and Jackson tied up Ms. Timmons. At one point, Ms. Timmons called out a window to a passerby. Jackson and Carter threw Ms. Timmons into a door and onto the floor, and repeatedly kicked, punched and beat her.

"Meanwhile, several witnesses, some of whom knew the four men, saw a blue jeep driven by Denard and a beige Jeep occupied by Lively, each with other men inside, approach a red Pontiac parked near 45th Street and St. Andrews. The men wore masks and dark clothes. Latonjyia Stover and Jamee Finney,

two women unconnected to these events, were inside the Pontiac, talking to a pedestrian.  When Stover and Finney saw the two jeeps drive by, they drove off, telling the pedestrian they feared a shooting was about to happen.  The two jeeps followed.

"Witnesses heard gunshots and saw the jeeps stop near the Pontiac and drive off.  Stover and Finney each died of multiple gunshot wounds.  Shortly thereafter, Robert [N.] heard gunshots and went outside.  Witnesses saw the beige Jeep occupants twice fire shots at [Robert N.]'s house, and once at another nearby house.  [Robert N.] saw the beige jeep occupants firing at people in the street.  [Robert N.] saw Lively, who[m] he knew, in the rear of the beige jeep pointing a gun.  [Robert N.] ran.  The beige jeep stopped and its occupants fired shots at [Robert N.]  Witnesses placed Lively and Porter inside the beige jeep when these shots were fired.

"Burks, Denard, Lively, and Porter returned to the apartment where Ms. Timmons was being held.  Denard, Lively, and Porter all boasted of the killings.  During another telephone call to Timmons, Denard told Timmons the defendants wanted their money.

"Meanwhile, Los Angeles Police Detective Mark Arneson learned from the telephone company that the calls from the defendants to Timmons had come from 13132 South Vermont Ave., apartment 6.  The police set up a command post nearby and began surveilling the apartment.  Porter left the apartment and drove off in a yellow Toyota.  Denard told Carter to go and warn his mother to leave her house because of potential retaliation from Bates.  Carter left.  When a police helicopter arrived overhead, Denard walked down the apartment hallway, went outside, and was arrested by police.

9

"When the remaining occupants saw Denard's arrest, Burks and Lively each telephoned their mothers and told them of the killings and to leave their homes to avoid retaliation. Lively then ordered Ms. Timmons to leave the apartment first, so if the police fired on them as they left, Ms. Timmons would be hit. Ms. Timmons, Lively, Jackson, and Burks then left the apartment, and police arrested the 3 men. Shortly thereafter, Carter returned in a white Hyundai owned by Denard. Ms. Timmons identified Carter and police arrested her. The police traced Porter to another house and arrested him the next day.

"Much circumstantial evidence also linked the defendants to the crimes. Police found the beige jeep parked behind the apartment. The jeep contained a bullet hole, bullet crease, powder burns, and an expended bullet. Lively, Porter, and Burks left fingerprints on the jeep, and Denard left a fingerprint on a plastic bag found inside it. Inside the apartment, police found ammunition, sunglasses, caps, and gloves. Some of the gloves contained gunshot residue.

"In the late afternoon of May 9, Porter telephoned Erik Taylor and asked Taylor to put 3 guns Taylor had under his mattress in a bag. Taylor did so. Porter arrived shortly thereafter and the 2 men drove to a nearby house. Porter took the bag inside the garage, then drove Taylor home. The next day, the police interviewed Taylor, who took them to the garage. Inside, the police found 2 guns and ammunition.

"At the murder scene, police recovered numerous shell casings and bullet fragments of similar caliber ammunition as used by the types of guns recovered in the garage and which witnesses described Burks, Denard, Lively, and Porter carrying

during the crimes. Police also recovered a black cap near the dwellings which had been fired on. A hair found inside the cap was similar to Lively's hair.

"Bates' sister Nina Bates, a prosecution witness, received telephone calls from Lively between Thanksgiving and Christmas 1988. Lively told Ms. Bates he had not committed the crimes, but he knew what she looked like, where she lived, and could get her if he chose to." (*People v. Denard*, *supra*, B066109.)

## DISCUSSION

### A.    The Resentencing Law

Prior to 2019, a jury could convict a defendant of murder under the felony-murder rule and natural and probable consequences doctrine without finding malice. Under the felony-murder rule as it existed before 2019, malice was imputed if the defendant intended to commit the underlying qualifying felony. (*People v. Chun* (2009) 45 Cal.4th 1172, 1184 [" 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' "].) Under the natural and probable consequences doctrine, as it existed before 2019, an aider and abettor could be held liable for any offense that was the natural and probable consequence of the crime aided and abetted. (*People v. Chiu* (2014) 59 Cal.4th 155, 158 [describing former law].)

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015, §§ 2–4) modified the law relating to accomplice liability for murder, eliminating the natural and probable consequences doctrine as a murder theory (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843) and more

11

narrowly defining felony murder. (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*); §§ 188, subd. (a)(3), 189, subd. (e)(3)). With respect to the former modification, "to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) (section 188(a)(3)): 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.' [Citation.]" (*Gentile*, at pp. 842–843.) Senate Bill No. 1437 also added former section 1170.95 providing the procedure for a defendant convicted of felony murder or murder based on the natural and probable consequences doctrine to request resentencing relief. (*Gentile*, at p. 843.)

Effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill No. 775) (Stats. 2021, ch. 551, § 2) amended section 1170.95. In addition to convictions based on the natural consequences and felony murder doctrines, persons convicted on a "theory under which malice is imputed to a person based solely on that person's participation in a crime" are eligible for resentencing relief. (§ 1172.6, subd. (a); see also former § 1170.95, subd. (a).) The bill clarified that persons convicted of attempted murder or manslaughter also may petition for resentencing. (*People v. Whitson* (2022) 79 Cal.App.5th 22, 30.) It further clarified that the burden of proof applicable in the evidentiary hearing is beyond a reasonable doubt. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1020–1021.) The Legislature then renumbered former section 1170.95 to section 1172.6 without substantive change. (*Strong, supra*, 13 Cal.5th at p. 708, fn. 2, citing Stats. 2022, ch. 58, § 10.)

Section 1172.6 describes a multipart process for resentencing petitions. The first step is making a prima facie case for relief. "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citation.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Strong*, *supra*, 13 Cal.5th at p. 708.) When evaluating a petition, the resentencing court may consider the record of conviction. (*People v. Lewis* (2021) 11 Cal.5th 952, 972.)

If the petitioner makes a prima facie case for relief, the court must issue an order to show cause. (§ 1172.6, subd. (c).) "If there has been 'a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner.' [Citation.] Additionally, the parties may stipulate that the petitioner is eligible for resentencing. [Citation.] Otherwise, the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3).)" (*Strong*, *supra*, 13 Cal.5th at pp. 708–709.)

In *Curiel*, the Supreme Court held with respect to an aider and abettor, that a jury's finding of intent to kill, by itself, does not establish ineligibility for relief at the prima facie stage. (*Curiel*, *supra*, 15 Cal.5th at p. 441.) "[A] petitioner who alleges that he or she could not currently be convicted of a homicide

13

offense 'because of changes to Section 188 or 189 made effective January 1, 2019' (§ 1172.6, subd. (a)(3)) puts at issue all elements of the offense under a valid theory." (*Curiel*, at p. 462.)  The allegation "is not refuted by the record unless the record conclusively establishes every element of the offense.  If only *one* element of the offense is established by the record, the petitioner could still be correct that he or she could not currently be convicted of the relevant offense based on the absence of *other* elements." (*Id*. at p. 463.)

" '[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." ' [Citation.]" (*Curiel*, *supra*, 15 Cal.5th at p. 463.)  "Similarly, to be liable for murder under a theory of implied malice, an aider and abettor must aid in the commission of a life-endangering act, with ' "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." ' [Citation.]" (*Ibid*.)

" 'Thus, proof of aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea'—which here includes knowledge that the direct perpetrator intends to commit the crime or life-endangering act, 'and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]" (*Curiel*, *supra*, 15 Cal.5th at p. 467.)

14

In *Curiel*, the court found the petitioner was not ineligible for resentencing as a matter of law because, notwithstanding the gang-murder special circumstance instruction in that case, the jury did not find the mens rea that either (1) the aider and abettor with knowledge of the unlawful purpose of the perpetrator intended to commit or encourage or facilitate the offense or (2) the aider and abettor with knowledge the perpetrator intended to commit a life-endangering act, intended to aid the perpetrator in the commission of that act, knowing the act was dangerous to human life, and in conscious disregard for human life.[6] (*Curiel, supra*, 15 Cal.5th at p. 468.) *Curiel* cautioned that its holding was limited to the jury instructions

[6] The gang murder special instruction in *Curiel* provided: " 'To prove that this special circumstance is true, the People must prove that: [1] the defendant intended to kill; [2] at the time of the killing the defendant was a member in a criminal street gang; and [3] the murder was carried out to further the activities of the criminal street gang.' " (*Curiel, supra*, 15 Cal.5th at p. 447.) The *Curiel* court also noted that the trial court instructed the jury: " 'To prove that the defendant is guilty of murder under the theory of aiding and abetting [based on] natural and probable consequences, the People must prove beyond a reasonable doubt that [1] the defendant is guilty of disturbing the peace or of carrying a concealed firearm by a gang member; [2] during the commission of the crime of disturbing the peace or of the crime of carrying a concealed firearm by a gang member the crime of murder was committed; and [3] under all the circumstances a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the crime of disturbing the peace or of the crime of carrying a concealed firearm by a gang member.' " (*Id*. at p. 446.) As detailed in our Discussion, Part B., *post*, the instructions in the case before us were different.

15

given in that specific case and "does not necessarily apply to other cases where the jury found intent to kill, or even other cases where the jury found true the gang-murder special circumstance." (*Id*. at p. 471.)

## B. The Trial Court's Instructions On Murder, Aiding and Abetting, the Special Circumstances Allegations, Conspiracy, and the Natural and Probable Consequences Doctrine

The court instructed the jury that "[a] person aids and abets the commission or attempted commission of a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime."

The court further instructed the jury: "Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging or facilitating the commission of the crime is not criminal. Thus a person who assents to, or aids, or assists in, the commission of a crime without such knowledge and without such intent or purpose is not an aider and abettor in the commission of such crime."

The court instructed the jury on natural and probable consequences as follows: "One who aids and abets is not only guilty of the particular crime that to his or her knowledge his or her confederates are contemplating committing, but he or she is also liable for the natural and probable consequences of any criminal act that he or she knowingly and intentionally aided and

16

abetted.  You must determine whether the defendant is guilty of the crime originally contemplated, and, if so, whether the crimes charged were a natural and probable consequence of such originally contemplated crime."

The jury instruction on conspiracy provided in pertinent part:  "A conspiracy is an agreement between two or more persons with the specific intent to agree to commit a public offense, and with the further specific intent to commit such offense, followed by an overt act . . . for the purpose of accomplishing the object of the agreement.  Conspiracy is a crime, but is not charged as an offense in the information in this case."  Also relevant to conspiracy, the trial court told the jury:  "A member of a conspiracy is not only guilty of the particular crime that to his or her knowledge his or her confederates are contemplating committing, but is also liable for the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy, even though such act was not intended as a part of the original plan and even though he or she was not present at the time of the commission of such act.

As to the crime of murder, the court instructed murder requires proof that:  "1.  A human being was killed.  [¶]  2.  The killing was unlawful, and [¶]  3.  The killing was done with malice aforethought."  The court also instructed the jury on express and implied malice.

For first degree murder, the jury was instructed on deliberate and premeditated murder.

With respect to second degree murder, the court instructed the jury on "unpremeditated murder of the second degree," "second degree murder [based on a] killing resulting from [an] unlawful act dangerous to life," second degree murder based on a

17

conspiracy "to commit a felony inherently dangerous to human life," and second degree felony murder based on several underlying felonies including kidnapping. (Boldface & capitalization omitted.)

Significantly, the trial court instructed the jury on three special circumstances—murder for financial gain, murder while kidnapping or kidnapping for ransom, and multiple murder convictions. By way of introduction to these special circumstances, the court told the jury: "If you find a defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: [¶] 1. The murder was committed for financial gain; [¶] 2. The murder was committed while the defendant was engaged in the commission of the crime of Kidnapping for Ransom or Kidnapping; and [¶] 3. Multiple murder convictions."

The introductory instruction also provided: "If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided and abetted, any actor in the commission of the murder in the first degree."

The court further instructed the jury that the jury "must decide separately each special circumstance alleged in this case as to each defendant" and "must agree unanimously." Thus, the multiple murder special circumstance and murder while kidnapping special circumstance instructions required the jury to find the defendant was either the "actual killer" or "with the

18

intent to kill, aided and abetted any actor in the commission of murder in the first degree."

## C.  Neither Porter Nor Lively Made a Prima Facie Case for Resentencing on the Murder of Stover (Count 9)

We review de novo the legal question whether petitioners are ineligible for relief as a matter of law.  (*People v. Bodely* (2023) 95 Cal.App.5th 1193, 1200.)

As part of a prima facie case, petitioners must show they "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (a)(3).)  Here, the record of conviction shows as a matter of law that petitioners were convicted of the Stover murder under currently valid murder law.

The jury found true a kidnapping and multiple murder special circumstance.  These findings, along with the trial court's above instructions, demonstrate that either the jury found Porter and/or Lively were the actual killers or the jury found true all the *Curiel* elements of aiding and abetting murder, that is, " 'a crime committed by the direct perpetrator' " (the perpetrator's actus reus), " 'the aider and abettor's mens rea,' " including " 'knowledge that the direct perpetrator intends to commit the crime or life-endangering act,' " and " 'the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]"  (See *Curiel, supra*, 15 Cal.5th at p. 467.)

Specifically, to find the multiple murder special circumstance and murder while kidnapping special circumstance allegations true, the trial court's instructions required the jury to find the defendant was either the "actual killer" or "with the intent to kill, aided and abetted any actor in the commission of

19

the murder *in the first degree*." (Italics added.) The jury's true finding on the special circumstances satisfies the elements that Porter and Lively intended to kill Stover and aided and abetted the perpetrator in the *murder* of Stover, not some other crime. Under the trial court's instructions, the jury's true finding shows that the jury also found Porter and Lively had knowledge of the direct perpetrator's unlawful intent. The instructions and the jury's verdict also demonstrate that the jury found Porter and Lively committed an act assisting in achievement of the murder. Because the jury necessarily found all of the requirements for murder under current law, Porter and Lively are ineligible for resentencing as a matter of law.[7]

The instruction on the natural and probable consequences doctrine does not undermine this conclusion. The instruction did not identify any target offense[8] and as noted above, by finding the kidnapping and multiple murder special circumstances true, the jury necessarily found that petitioners aided and abetted *the murder* of Stover, not some other crime. We reject Porter's hypothesis that the jury could have found he aided and abetted a crime other than murder. The special circumstance instructions

---

[7] In the alternative, under the special circumstance instructions, the jury could have concluded that Porter and Lively were actual shooters. The actual shooter is not eligible for resentencing. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14; *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

[8] Lively states that the jury could have found his "act and intent in aiding and abetting a lesser target offense did ultimately in fact aid the shooter in the shooter's commission of first degree murder." Lively does not cite to the record for support and we find no support for his assertion.

20

required the jury to find Porter (and Lively) aided and abetted *murder* in order for the jury to find the special circumstance allegations true. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30 [court presumes jury followed jury instructions].)

Porter notes that the instruction on conspiracy referred to a public offense. As explained above, however, the jury verdict, read in light of the other instructions—particularly the instruction on the special circumstances—shows the jury necessarily found true all elements of murder. Put differently, under the given instructions, the jury could not have found the special circumstances true by finding Porter committed a public offense other than murder.

Porter contends the prosecutor argued Porter's participation in the underlying kidnapping for ransom allowed the jury to convict him of first degree murder. The record does not support the argument. The prosecutor argued that the special circumstance required the prosecution to show the defendant "shared that intent to kill." The prosecutor argued: "Again, there has to be an intent to kill on the part of basically all the defendants . . . ." Additionally, the trial court instructed the jury, "Ladies and gentlemen, with respect to my instructions, I want to remind you anything stated differently by the attorneys than I stated, you are to follow my instructions . . . ." Even assuming that Porter correctly characterizes the prosecutor's argument, the jury verdict nevertheless shows that the jury found all elements of murder under current law.

Finally, Porter and Lively argue the resentencing court incorrectly weighed the evidence. We do not address this issue because we have considered petitioner's eligibility for sentencing

21

relief de novo and conclude, without weighing any evidence, that as a matter of law, petitioners are ineligible.

## D. The Court Applied the Correct Standard of Proof at Porter's Order To Show Cause Hearing

At Porter's order to show cause hearing, the resentencing court found Porter harbored intent to kill and aided and abetted the murder of Finney by purchasing bullets. The resentencing court also concluded Porter could be convicted of felony murder based on the underlying kidnapping and that Porter was a major participant who acted with reckless indifference to human life. The court further stated Porter and his confederates could be convicted of conspiracy to commit murder. Porter does not dispute any of the resentencing court's findings. Porter, however, argues the resentencing court applied the incorrect standard of proof. The record reveals otherwise.

Section 1172.6, subdivision (d)(3) requires the prosecution to prove "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." It expressly rejects substantial evidence as the applicable burden: "A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).)

Contrary to Porter's argument, the record unequivocally reflects that the resentencing court applied the correct burden of proof and acted as an independent factfinder. The resentencing court evaluated the evidence and found it overwhelming. The court stated it was basing its decision on "the evidence presented at trial." The court referred to the witnesses at trial and found

22

Timmons's (also known as Davis's) testimony credible. The court comprehensively summarized the evidence as presented at trial and highlighted the evidence the court believed supported its findings. As if this were not enough, the court stated it was applying a beyond-a-reasonable-doubt standard and rejecting the different standard in *People v. Duke* (2020) 269 Cal.Rptr.3d 264 that in Senate Bill No. 775, the Legislature also subsequently rejected.

Porter emphasizes that the resentencing court referred to *People v. Rodriguez* (2021) 272 Cal.Rptr.3d 342, which has been depublished. *Rodriguez* held that the resentencing court was required to act as an independent factfinder and apply a beyond-a-reasonable-doubt standard. (*Id.* at p. 355.) That is the same standard Porter argues the resentencing court should have applied. There is no merit to Porter's argument that the resentencing court's reference to the *Rodriguez* standard of proof shows that it misunderstood the applicable standard.

Porter also states the resentencing court erred in relying on *People v. Hernandez* (2021) 60 Cal.App.5th 94. But just like *Rodriguez*, *Hernandez* relied on the same beyond a-reasonable-doubt standard of proof that Porter advocates. Put simply, the resentencing court's reference to those cases does not show the court applied an incorrect standard of proof.

Porter is correct that a resentencing court cannot rely on the facts recited in an appellate opinion and must be an independent factfinder. (*Vance, supra*, 94 Cal.App.5th at p. 713.) The record demonstrates that the resentencing court was an independent factfinder, Porter's misunderstanding of the court's remarks notwithstanding. The resentencing court did not rely on facts recited in our prior opinion but instead, agreed with those

23

facts in stating the "language" of the appellate opinion is the same as the facts the court "read [in] the trial transcript." The court expressly indicated, the "appellate opinion" was not a "bible on what the facts are . . . ." The fact that the trial court commented that its view of the evidence was consistent with the facts recited in our prior opinion does not demonstrate the court failed to act as an independent factfinder.

Porter also takes out of context the resentencing court's reference to "could be convicted" either during colloquy with co-defendant Jackson's counsel or in explaining its reasoning. For example, in responding to counsel for Jackson's argument that Jackson could not be convicted of second degree felony murder, the court stated, "The question is whether a valid murder theory exists today based on the facts in the case that your client could be convicted . . . ." The resentencing court stated, "[The] evidence in this particular case is overwhelming that they could still be convicted, under any of these theories, of Ms. Finney's murder under current law." The court stated that all petitioners (including Porter as well as his confederates Jackson and Burks) "could be convicted today of a valid theory of murder . . . ." The court found that Porter could be convicted of felony murder because felony murder now includes kidnapping. In making these statements, the resentencing court was merely considering murder theories viable under current law, that is, theories of which Porter "could" still be convicted notwithstanding the changes to sections 188 and 189.

Finally, Porter hypothesizes that "the court may not have been entirely clear" on then "very recent statutory changes effected through Senate Bill 775" because in discussing the Stover murder (count 9), the court considered what the jury

24

found.  The analysis for a prima facie case of eligibility is not the same as the standard of proof applied at an order to show cause hearing.  The former addresses whether as a matter of law, the record of conviction demonstrates "conclusively" that the petitioner was convicted based on a currently valid murder theory.  The latter requires a finding that the petitioner is guilty beyond a reasonable doubt under a still valid murder theory.  The resentencing court's analysis of whether Porter made a prima facie case of eligibility with respect to the murder of Stover is thus not informative as to whether the court applied the correct standard at the order to show cause hearing.

Porter argues that the court abused its discretion in applying an incorrect legal standard and that this purported error prejudiced him.  Because we conclude there was no such error, we do not consider Porter's prejudice claim further.

**E.**   **Lively Was Present at the Order To Show Cause Hearing and Lively Demonstrates No Error in the Court's Granting His Motion To Appear Via Webex**

Lively argues he was not present at the resentencing hearing and that we thus must reverse the denial of his petition for resentencing on count 10 (Finney murder).  We first provide additional background and then discuss his argument.  We conclude his argument is based on the incorrect premise that he was not present at the hearing.  Lively was present via Webex, which he requested based on emergency rules in effect at the time of Lively's order to show cause hearing.

**1.**   *Additional background*

On October 15, 2021, prior to the order to show cause hearing, Lively's counsel filed the "Pre-Hearing Memorandum"

stating that at the order to show cause hearing: "Petitioner reserves the right to testify, to call witnesses, or to present any documentary evidence following the prosecution's case in chief at the hearing. This includes, but is not limited to, potentially asserting that [the detective who investigated the case] committed misconduct during the course of this case and that his actions and omissions caused Petitioner, who is legally, factually, and actually, innocent, to be convicted."

On January 6, 2022, the resentencing court continued Lively's order to show cause hearing because Lively could not be transported from prison. The court indicated it would ask the supervising judge "to give this special treatment so that this person [Lively] can be transported." Lively's counsel stated, "In the alternative, could we do it by Webex?" The court agreed to proceed via Webex but only if Lively's counsel was able to make arrangements with prison officials.

On March 14, 2022, counsel for Lively filed a motion requesting that Lively appear "via video from High Desert State Prison." Counsel based the motion on the following grounds: "California Judicial Counsel's [*sic*] Emergency Rules Related to COVID-19 and good cause appearing because Petitioner has waived his appearance in-person at the hearing and requests to appear via video from High Desert State Prison Housing."

The motion further indicated: "Petitioner has the right to be present at the evidentiary hearing . . . Petitioner waives his personal appearance and requests to attend the . . . hearing via video from High Desert State Prison housing." Counsel stated: Lively "does not wish to be transported to personally appear for the March hearing. Petitioner waives his personal appearance. To protect the health and safety of the public, including court

26

users, both in custody and out of custody defendants, witnesses, court personnel, judicial officers, and Petitioner, this Court should order the warden of High Desert State Prison to produce Petitioner via video for the March 24, 2022 hearing." Counsel declared under penalty of perjury that Lively "waives his personal appearance at the hearing and requests to attend via video from State Prison."

The resentencing court found good cause and ordered Lively to appear via Webex.

Lively appeared at the March 24, 2022 order to show cause hearing via Webex. The court asked Lively if he could hear and Lively responded, " Yeah. I barely can hear you." The court stated, "I'm using a microphone, so it's not going to get much better than this." The court asked Lively to raise his hand and Lively raised his hand.

At the order to show cause hearing, the resentencing court stated, "[T]he prosecution has to prove beyond a reasonable doubt each element of a first or second degree murder under current law to establish a petitioner's ineligibility for relief under the statute. In order to meet this burden, the prosecution may rely on the record of conviction and/or offer new or additional evidence to support the claim that the petitioner is ineligible." The court "emphasize[d]" it was acting "as an independent fact finder."

Neither side offered new evidence. Counsel for Lively argued Lively was not in the Jeep from which the shots were fired. Counsel argued Lively was "innocent of the murder" and "did not know about the murder during the shooting in the case."

The resentencing court found statements by Porter and Denard indicating they were the shooters were "unreliable because each of them has a motive to lie and help their friend

27

Lively get out of jail . . . ." The court indicated Lively also could have been a shooter.

The court found Lively aided and abetted the murder. Lively was "all in" on the plan to kill Bates's family members because B.J. Bates cheated Porter and Denard. The court also found "most of the testimony" at trial showed Lively was in the beige Jeep with Burks. The beige Jeep and the blue Jeep were in the vicinity of the Pontiac (driven by Stover in which Finney was a passenger) at the time of the shooting. The court observed that Lively's statements reflected his intent to kill when Lively said, " 'It is all about killing. We dangerous people. That is our money.' " The court also stated Lively could be convicted under a valid felony-murder theory with kidnapping as the underlying offense.

At the conclusion of the hearing, Lively's counsel pointed out Lively's video had disconnected a few seconds earlier. The court stated, "He is off. I was going to conclude my decision anyway. [¶] When did he go off?" Counsel responded, "Just a couple seconds ago." The court then stated, "Well, I have to indicate, I don't know how he left, if he left on his own, or whatever, but I don't really have anything else to say. That is my decision; I'm denying 1170.95 motion on behalf of Mr. Lively."

2. ***Lively was present at the order to show cause hearing and he demonstrates no error or prejudice in appearing remotely***

The parties do not dispute that a criminal defendant has a constitutional and statutory right to be present at critical proceedings. (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 124 (*Whitmore*).) Lively claims he was not present. As set forth

28

above, the record reveals he was present and appeared by Webex at his request.

Lively relies principally on one case to argue we nevertheless must remand for a new evidentiary hearing on count 10—*People v. Basler* (2022) 80 Cal.App.5th 46, 56–60. In *Basler*, however, the petitioner was not present either in person or remotely. (*Id*. at p. 57.) The same is true in *People v. Quan* (2023) 96 Cal.App.5th 524, 530. These facts produced appellate rulings that the petitioner's complete absence was constitutional error because the order to show cause hearing constitutes a critical stage of criminal proceedings. (*Basler*, at pp. 57–58; *Quan*, at pp. 532–534.) Neither *Basler* nor *Quan* considered whether a petitioner's remote appearance at an order to show cause hearing is constitutionally infirm, and thus neither supports remand for a new hearing on Lively's petition. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [" ' "[C]ases are not authority for propositions not considered." ' "].)

The resentencing court granted Lively's motion to appear via Webex. Lively based his motion on former emergency rule 3. That rule was a response to the global COVID pandemic[9] and provided for remote appearance in "any criminal proceeding" as long as the defendant consented.[10] Although this rule has

---

[9] (See *Whitmore, supra*, 80 Cal.App.5th at p. 125.)

[10] Emergency rule 3(a)(2), provided in part: "In criminal proceedings, courts must receive the consent of the defendant to conduct the proceeding remotely and otherwise comply with emergency rule 5. Notwithstanding Penal Code sections 865 and 977 or any other law, the court may conduct any criminal proceeding remotely. As used in this rule, 'consent of the defendant' means that the consent of the defendant is required only for the waiver of the defendant's appearance as provided in

sunsetted, it was in effect at the time of Lively's hearing. (*Rycz v. Superior Court* (2022) 81 Cal.App.5th 824, 838, fn. 9.) Even though he relied on this former rule below to secure Webex appearance, Lively does not mention it on appeal. A fortiori, Lively does not argue that his counsel's declaration was insufficient to support his consent to Webex appearance under former emergency rule 3.

Even assuming arguendo that the resentencing court erred in allowing Lively to appear remotely, Lively demonstrates no prejudice.

In *Whitmore*, the court rejected a due process challenge to requiring the defendant there to appear remotely without his consent but held it was a violation of state law to have required the defendant to appear remotely at sentencing and other proceedings without his consent. (*Whitmore*, *supra*, 80 Cal.App.5th at pp. 125–126.) Accordingly, the error would be reviewed for prejudice under the *Watson*[11] standard. (*Whitmore*, at pp. 125–127.) Under that standard, we "analyze whether it is reasonably probable [petitioner] would have received a more favorable result had he been physically present in the courtroom." (*Id.* at p. 127, fn. 6.)

Lively does not argue that it is reasonably probable he would have received a more favorable result had he been physically present in the courtroom rather than appearing remotely via Webex. Lively does not show anything would have been different had he been in the courtroom. We thus conclude

emergency rule 5." (Cal. Rules of Court, appen. I, former emergency rule 3.)

[11] *People v. Watson* (1956) 46 Cal.2d 818.

he suffered no prejudice from appearing remotely instead of in person.[12]

## F. The Parties Agree and the Record Shows Clerical Error in Lively's Sentence

The court sentenced Lively to a term of 15 years to life for count 9 (the first degree murder of Stover) and life without the possibility of parole for both count 1 (the kidnapping for ransom) and count 10 (the second degree murder) of Finney. We agree with the parties that the trial court transposed counts 9 and 10 in its judgment. More specifically, the trial court imposed a first degree murder sentence for the second degree murder and a second degree murder sentence for the first degree murder. As Lively argues in his reply brief, "it appears the trial court simply committed a clerical error in transposing the appropriate and mandatory sentences for Counts Nine and Ten, and it is undisputed that such clerical errors in a defendant's sentence can be corrected at any time." We agree. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [trial court has inherent power to correct clerical errors at any time].)

---

[12] Although we recognize Lively was absent for a few seconds at the end of the proceeding, that absence was harmless under any standard of prejudice. On appeal, Lively does not argue otherwise.

31

## DISPOSITION

The orders denying John Jay Porter's and Dayon Darren Lively's petitions for resentencing are affirmed. Lively's case is remanded to the resentencing court to correct the judgment. Specifically, the term of life without parole shall be imposed for count 9 and for kidnapping for ransom (count 1) and the term of 15 years to life shall be imposed for count 10. The resentencing court shall send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

CHANEY, J.

WEINGART, J.